Staples, J.,
delivered the opinion of the court.
*131 The commonwealth’s attorney for the county of Henrico sued out a writ of quo warranto against William L. Royall, alleging that the latter was disqualified to hold office under the government of Virginia by reason of his having been engaged as a second ina ■duel fought in that county in the year 1873. The defendant did not in express terms deny the charge; but he averred that he had never been convicted of being ■engaged in a duel. To this answer the commonwealth •demurred; and the demurrer was sustained by the -circuit court. The defendant not desiring to put in ■any further answer, judgment was rendered against him of amotion from his office. To that judgment he •obtained a writ of error from one of the judges of 'this court. The ground taken by the defendant is, that the provision in the Virginia constitution upon the subject of dueling is not self-executing, and that a ■conviction founded upon indictment and trial, according to the forms of the criminal law, is necessary before the disqualification for office attaches under the .government of the state.
The principal authority relied on in support of this position is the case of the Commonwealth v. Jones, decided by the supreme court of Kentucky, and reported in 14 Am. Law Reg., N. S., 374, and also in 10 Bush 725.
It was there held that the clause in the Kentucky constitution imposing the disqualification for office for the offence of dueling is not self-executing, except so far as it prevents those who cannot or will not take the requisite oath from entering upon office. A citizen willing, however, to take Buch oath cannot be proceeded against for usurpation of such office until he has been first indicted, tried and convicted of the •disqualifying offence. This case seems to be a strong *132 authority for the defendant; but it will be found ou examination, that much of the reasoning of the court-turns upon the peculiar phraseology of the Kentucky constitution, in which it is declared that the offender “shall be deprived of the right to hold any office, post or trust under the authority of the state. The court agreed, that if instead of the words “shall be deprived,” the phrase “ shall not be eligible” had been, used, some of the difficulties attending the argument to show the provision is self-executing would have-been obviated.”
In the case of Cochran v. Jones, involving the same question, “the board, for the determination of contested elections” arrived at a very different conclusion upon the same clause of the Kentucky constitution, holding that the political disability resulted from the commission of the offence, and is in nowise dependent upon a previous criminal conviction. This, board consists of the governor of the state, the secretary of the state, the attorney general, the state treasurer, and the auditor general. See 14 Am. L. Keg., N. S., page 222. In the previous case of Morgan v. Vance, 4 Bush 330, the supreme court of that state held, that “ so far as the constitution prescribes disqualification upon acts and not upon judgment of conviction, the constitution, as the supreme law of' the land, executes itself without any extraneous aid by way of legislation; nor can its requirements be defeated.” It will thus be seen that even in Kentucky there is such conflict of opinion in respect to the true interpretation of the constitutional provision in question as deprives the decision relied on by the defendant of the weight of being considered even persuasive authority.
The provision in the Virginia constitution is as fol *133 •lows: “Ho person who, while a citizen of this state, has -since the adoption of this constitution fought a duel with a deadly weapon, sent or accepted a challenge to fight a duel with a deadly weapon, either within or beyond the boundaries of this state, or knowingly conveyed a challenge, or aided or assisted in any manner in fighting a duel, shall be allowed to vote or hold any •office of honor, profit, or trust, under this constitution.” It has been made a question whether this provision is prospective in its operation. There is, however, no solid ground for controversy on this point. The words might perhaps have been more aptly chosen, but they clearly mean to declare, that any person who after the adoption of the constitution engaged in a duel as principal or second, should be subject to the disability in that section mentioned. However this may be, the legislature at its session of 1869 ’70 passed an act carrying out the provision of the constitution, •substantially reenacting that provision, giving it a prospective operation, and emphatically declaring that no person offending against the act “ shall be capable" of being elected, or appointed to, or of holding any office -of honor or profit under the commonwealth.” It will be perceived that the language, both of our constitution and of our statutes is very different from that of the Kentucky constitution. In our case, if the constitutional provision required any aid from extraneous legislation, it has been given by the statute already •cited. It is also perfectly apparent that the framers of the constitution, and of the statute, designed that the disability to hold office should attach upon the commission of the offence, and not upon judgment of conviction. In the clause next preceding the one already quoted, the constitution in enumerating the persons disqualified by reason of certain offences, specifies *134 “persons convicted of bribery in any election, embezzlement of public funds, treason or felony.” It is also-provided elsewhere that persons convicted of perjury or subornation of perjury, shall .be incapable of holding office.
In the class of infamous and degrading offences, it would seem a conviction is required as a prerequisite, to the .political disability. But with respect to the violation of the anti-dueling law, and other laws which are not supposed to involve so great a degree of moral turpitude, a different rule is established. If in this latter class of offences it had been the purpose to prescribe a conviction as the test of disqualification, it would have been easy to do so by a single change in the form of the expression. If we recur to the statute of 1810, and to tbe subsequent laws on the subject of dueling, and if we compare these enactments with other statutes prescribing a conviction as a test of disqualification, the conclusion is inevitable that the purpose was not to require a conviction as a test of disqualification in cases of dueling; but to leave it as a question of eligibility to the tribunals clothed with authority to decide contested elections or to try titles, to offices.
This design of the framers of our law is founded upon the most satisfactory reasons, and upon considerations of the soundest public policy. As was said by Judge Baldwin in Moseley v. Moss, 6 Gratt. 534, 539, “Dueling received no indulgence whatever from the common law, which treated its conventionals and its chivalry as solemn mockeries, and its violence and bloodshed as the results of deliberate malice. But these denunciations were resisted by long cherished prejudices of society, which appealed with dreadful success to some of the strongest principles of human *135 conduct—the pride of- character, the fear of humiliation, and the love of distinction.”
It is said by a learned author, that in the reign of George the Third about one hundred and seventy duels were fought, of which not less than seventy resulted fatally, but in no instance was a conviction ever obtained when the duel was fairly fought according to the terms of the code of honor. The British parliament passed the most stringent laws on the subject in aid of the common law; but they were wholly ineffectual to arrest the practice, or even to moderate its excesses. The defect was not in the laws, but in the tribunals to administer them. A writer of great distinction (Mr. Starkie), in a report made to parliament on this subject, said: “Experience leads to the conclusion that the practice of dueling is not controllable by merely penal laws.” Universal observation confirms the truth of this statement.
Notwithstanding the severity of the criminal law, the juries were determined to acquit, and their verdicts were winked at by the judges, and received with acclamations by a sympathizing public. It is recorded of a trial which occurred in 1792 in England, the learned judge went so far as to tell the jury, that although an acquittal might trench upon the rigid rules of law, yet the verdict would be lovely in the sight of God. Such was the state of public sentiment and administration of criminal law in England. Deriving our customs, laws, literature and fashions from that country, it was natural we should imitate them in a practice which, according to prevalent opinion, encouraged forbearance, generosity of sentiment, and manliness of conduct in society.
The long series of our judicial annals in Virginia show but few cases, if any, of conviction of either prin *136 c^Pa^ or seconds, especially where death ensued. Universal experience has demonstrated the truth of the observation that the practice of dueling could not be restrained by 'penal laws. Fully comprehending the difficulties of the situation, the legislature of 1810 addressed itself to the subject. The preamble to the act then passed (the very first ever enacted in the state) commences: “Whereas experience has evinced that the existing remedy for the suppression of the barbarous custom of dueling is inadequate to the purpose, and the progress and consequences of the evil have become so destructive as to require an effort on the part of the legislature to arrest a vice, the result of ignorance and barbarism, justified neither by the precepts of morality nor by the dictates of reason; for remedy whereof, be it enacted:” The first section then announces the penalty of death by hanging upon all who engage in a duel resulting in death, principals, seconds, aiders and abettors.
The second section imposes the disability to hold office upon any person sending or accepting a challenge, whatever be the result of the duel.
And the third section prescribes the expurgatory or test oath to be taken by any person elected or appointed to any office or post under the government of Virginia.
A slight examination of these provisions, and of the causes which led to their adoption, will satisfy every one that the design of the legislature was to provide a ' two-fold remedy, the one criminal, and the other purely civil in its nature. By the one, the offender was punished as a felon—by the other, he was excluded from every position of honor or profit under the government of Virginia. These two remedies had no necessary connection one with the other. *137 They were wholly independent , of each other. The ■first section prescribed the punishment of death for homicide in a duel; but the common law did the same ■thing; and we know how powerless were its mandates or its terms to cheek the evil. The statute •standing alone would have proved equally ineffectual. The very severity of its punishment would have, and indeed has, insured its defeat. The main reliance of the legislature was upon the second and third sections. It was on the direct appeal to the most powerful motives that control the human heart. The men most likely to resort to the duel as a mode of arbitrament were the men generally most ambitious of public honors, power and distinction. These men would feel most keenly their entire exclusion from every hope of preferment. Many of these, confronting death without a tremor, would hesitate long before involving themselves and friends in the consequences of a perpetual disability, political, executive and judicial. Universal observation teaches that the love of place and power, the ambition to serve the ■state, to connect one’s name with distinguished public -services, and to attain those great honors, which attract the applause of the world, are among the most powerful motives influencing mankind. It was to •these the legislature of 1810 appealed.
In Brooks v. Calloway, 12 Leigh 466, Judge Allen said: “The effect of these statutes has been most beneficial; the practice has been repressed.” But who ■can fail to see how utterly valueless is all this legislation if the disabilities depend upon a previous criminal conviction. If no man can be excluded from •office for violating the constitution until a jury can be .found to convict, and a court to sentence him to an infamous punishment, the statute of 1810, and all the *138 succeeding laws on the subject, are the merest mockeries. The juries have heretofore set at defiance the penal laws relating to dueling, is it supposed they will be more inclined to hang offenders by the neck, or to put them in the penitentiary, when it comes to be' understood this is the only way to exclude them from office. The legislature has repealed the test oath. Let the courts now decide that the disqualification for’ office cannot attach until there is a conviction, and we shall have contributed something at least to the revival of the ancient practice of dueling.
But let us see where the argument leads us. If a. man kills his adversary in a duel it is murder in all concerned. If the juries and the judges obey the law it is hanging by the neck, or at the least confinement'in. the penitentiary. Of what avail is our boasted disability applied to men thus situated. This is the necessary result, unless we suppose a jury can be found to convict just enough to disqualify, but not .quite sufficient seriously to discommode the offender.
But this is not all. All of us understand the great difference in the position of one wThen on trial for his-life upon a charge of murder and when he is proceeded against for usurping an office. Upon the trial of a criminal cause, if ’a reasonable doubt can be-raised by the evidence, or by the ingenuity of counsel,, that doubt is decisive for an acquittal. As has been well said, “A verdict of not guilty means no more-than that the guilt of the accused has not been demonstrated in the precise, specific and narrow forms, prescribed by law.” Most professional men are familiar with the trial of the Earl of Cardigan, before the House of Lords, for shooting at Capt. Tuckett in a duel. The combat took place near a mill, and was witnessed by the miller, his wife and daughter, who. *139 were on the ground a few minutes after the occurrence, and conversed with the parties. With these witnesses the attorney general of England was unable ' to obtain a conviction because he could not prove the identity of the Captain Tuckett who was wounded according to his description in the indictment. If Lord Cardigan had been proceeded against for usurping an office under the Virginia statutes, he might-have pleaded as .the defendant has, that he was never convicted. If he had said he was never engaged in a duel, the contrary was susceptible of the clearest proof. And this because upon the trial of a civil cause very different rules prevail. In the latter the courts decide according to the preponderance of evidence. It is obvious, therefore, in many instances, an incumbent might be ousted from an office, and very properly too, upon evidence which a jury would deem insufficient for a criminal conviction.
It is to be further remembered that with respect to-a very large number of offices in this state, their terms would necessarily expire before a conviction can be obtained. If the offender succeeds in getting possession of the office, the commonwealth is bound to submit to the intrusion until she can institute proceedings of a criminal nature, and await until the tardy steps of criminal justice have demonstrated his guilt.
But there is still another -view suggested to the court by a distinguished member of this bar. Under the provision of our constitution already cited, if a citizen of Virginia goes to a distant state and there engages in a duel, he is thereby disqualified to hold office here, although he left the state without an intention of fighting a duel. How is his disqualification to appear? Certainly not by a conviction, because the offence can only be punished here criminally when the- *140 citizen leaves the state' for the purpose of the duel. The state has made no provision to punish one of her ■ citizens who without previous design engages in a duel beyond her borders; nor could she justly or legally punish offences thus committed on foreign territory. It follows inevitably that if the view of the defendant be correct, this part of the provision of the constitution is-a nullity.
These considerations, I think, are quite sufficient to show that the framers of our laws could never have designed to make a criminal conviction in this class of offences necessary to the ascertainment of the -civil and political disability. Their failure to do so, as we perceive, was not accidental, but the result of deliberate purpose—a determination to eradicate an evil which was annually destroying some of the best men of the state. The offices are made for the benefit of the people. It is competent for them to prescribe such qualifications as they see fit. Ho man has an indefeasible right to an office. If the sovereign power of the state requires a conviction in one case as the ground of disability, and dispenses with it in another case, whatever be the motive, it furnishes no just cause of complaint.
Under the former constitution no minister of any religious denomination was capable of being elected a member of the legislature, and no foreign born citizen was eligible to the office of governor of the commonwealth. Might it not be said, with great propriety, that this was in effect a punishment of a large and respectable class of men who might justly complain of an arbitrary exclusion. But no one can ever imagine that these disqualifications, or whatever else they may be termed, could only be established by some judicial proceeding involving a trial by jury *141 and the regular sentence of a court of law. What rule of law or of the constitution is there beyond what is expressly provided requiring the application of dif-_ ferent forms and rules of evidence -to establish the disqualification in different cases. True, dueling is punished also as a criminal offence. But in the case supposed the commonwealth is not prosecuting for the felony. She seeks no criminal forfeiture or conviction. The civil proceeding is simply to try the title to an office, and has no sort of connection with the punishment denounced by the penal law.
The constitution provides that the governor, lieutenant governor, judges, and all others offending against the state by mal-administration, corruption, or other high crimes and misdemeanors, may be impeached before the senate and removed from office. Dueling being a high crime, especially where death ensues, is, of course, just cause of removal. If the accused is convicted, he is not only removed from office, but he is forever disqualified to hold any other office under the state. Will it be contended that in such case a previous conviction is essential to the success of the impeachment. So far from it, the very clause in question provides that the party removed from office by the Senate shall, nevertheless, be subject to indictment, trial, judgment and punishment, according to law, thus showing a judgment of ouster may precede the trial under an indictment. If there is any value in the doctrine as laid down by the Kentucky court, it would be in cases of impeachment. The accused is punished by perpetual disqualification, without trial by jury, and by a body of men, many of whom are elected without any reference whatever to-judicial capacity and attainment. And the present constitution goes a step further, authorizing the remo *142 val of any of the officers named, simply upon a joint vote of the two houses. If the senate may remove ■ the highest executive officer in the state without previous trial and conviction, surely the courts may be safely trusted with the power of removing the clerks, sheriffs, notaries, and other subordinate officers for like causes upon the same character of evidence. In both tribunals the defendant is duly notified of the accusation, and he is afforded every opportunity of defence he can reasonably desire. The proceeding by information, in the nature of a quo warranto, is as direct as an indictment; an issue is made up; and there is as little danger of injustice in the one form of proceeding as in the other. In cases of contested election the law has provided tribunals to adjudicate the rights of the respective claimants. ■ These tribunals thus clothed with jurisdiction to try the title to an office, would seem, upon general principles, to have the power to ascertain and consider, all such facts as relate to the question of eligibility. McCrary on Elections, 198.
My opinion therefore is, whether the proceedings be to try the title of an incumbent, or to adjudicate the claims of an applicant for an office, it is legal and proper to establish the disability imposed by the constitution in cases of dueling by any competent and satisfactory evidence. The judgment of ' the circuit ■court, for the reasons stated, must be affirmed.
So far as the defendent is concerned, the question •decided is perhaps of but little importance to him, as it is understood he is embraced within the amnesty act passed by the present legislature. Whether that act includes all persons in the state under disability by reason of a violation of the anti-dueling statutes is not known. At all events the question is a grave one, likely *143 to arise at any time hereafter. We have, therefore, ■deemed it best to give the subject a careful consideration, and to place the whole matter beyond the pale of discussion, so far as the unanimous opinion of this court can effect that object.
In regard to the point raised by the attorney general, that the writ of quo warranto is no longer in use in this •state, if ever in use here, but has been superseded by the information in the nature of a quo warranto; we have not deemed it necessary to express any opinion. The writ in this ease was sued out by an officer of the commonwealth, was not objected to by the defendant, ■and is not now objected to by him. It was agreed by the parties in the court below to waive all formal pleadings, and to submit the whole matter to the court. Under such circumstances the court is not inclined to dismiss the whole proceeding from its inception, because the complaint is called a writ of quo warranto rather than an information.
Judgment aeeirmed.